UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

ANTHONY R. FLAAEN,

                         Plaintiff,

        v.

PRINCIPAL LIFE INSURANCE
COMPANY,

                         Defendant.

CASE NO. C15-5899 BHS

FINDINGS OF FACT,
CONCLUSION OF LAW, AND
ORDER

        This matter comes before the Court on Plaintiff Anthony R. Flaaen's ("Flaaen")

trial brief on the administrative record (Dkt. 33) and Defendant Principal Life Insurance

Company's ("Principal") motion for judgment on the administrative record (Dkt. 34).

The Court concludes that Flaaen is entitled to a reinstatement of benefits and an award of

benefits back to the date of termination.

## I.    PROCEDURAL HISTORY

        On December 10, 2015, Flaaen filed a complaint for long-term disability benefits

against Defendants McLane Company, Inc. ("McLane") and Principal Life Insurance

Company, Inc. ("Principal").  Dkt. 1.  Flaaen's sole claim is wrongful denial of benefits

under the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001, *et seq.* ("ERISA"). *Id.* On February 1, 2016, Flaaen dismissed McLane. Dkt. 6.

On June 22, 2016, Flaaen filed a motion for partial summary judgment arguing that the applicable long-term disability plan's ("LTD") discretionary clause is invalid and unenforceable as a matter of law. Dkt. 16. On December 22, 2016, the Court granted the motion and determined that the standard of review is *de novo*. Dkt. 28.

On April 3, 2017, Principal filed the administrative record. Dkt. 31. On May 4, 2017, Principal supplemented the record. Dkt. 32.

On May 31, 2017, the parties filed opening briefs. Dkts. 33, 34. On June 16, 2017, the parties responded. Dkts. 36, 37. On June 30, 2017, the parties replied. Dkts. 39, 40. On August 9, 2017, the Court requested additional briefing. Dkt. 42. On August 18, 2017, the parties submitted additional responses. Dkts. 43, 44. On August 25, 2017, the parties submitted additional replies. Dkts. 46, 47.

## II. FACTUAL BACKGROUND

### A. The Plan

On August 31, 2005, McLane applied for a group LTD plan with Principal. AR 119–123. On January 1, 2006, Principal issued an LTD plan effective that day. AR 1– 118 ("Plan"). Relevant to this matter, the Plan provides that "A Member will qualify for Disability benefits if . . . The Member is Disabled under the terms of this Group Policy." AR 36. The Plan defines Disability and Disabled as follows:

> A Member will be considered Disabled if, solely and directly because of sickness, injury or pregnancy:

During the Elimination Period and the Own Occupation Period, one of the following applies:
a. The Member cannot perform one or more of the Substantial and Material Duties of his or her Own Occupation.

\*\*\*

After completing the Elimination Period and the Own Occupation Period, one of the following applies:
a. The Member cannot perform the majority of the Substantial and Material Duties of any Gainful Occupation for which he or she is or may reasonably become qualified based on education, training, or experience.
b. The Member is performing the Substantial and Material Duties of his or her Own Occupation or any occupation on a Modified Basis and is unable to earn more than 60% of his or her Indexed Predisability Earnings.

AR 36–37.

The Plan defines Own Occupation as "The occupation the Member is routinely performing when Disability begins as performed in the national economy." AR 38. The Plan defines Gainful Occupation as "Employment in which the Member could reasonably be expected to earn an amount equal to or greater than the Primary Monthly Benefit." AR 38. Finally, the Plan proscribes that benefits will not continue beyond "the date Disability ends." AR 50.

**B.     Flaaen's Benefits**

On June 12, 1989, McLane hired Flaaen as a truck driver in Tacoma, Washington. Dkt. 16-1, Declaration of Chris Roy, ¶ 6. On September 21, 2006, Flaaen suffered an injury to his back. AR 1813. His last day of work for McLane was January 29, 2007. *Id.* On April 10, 2007, Flaaen applied for LTD benefits under the Plan. AR 1811. On June 8, 2007, Principal approved benefits effective July 29, 2007, at an amount of $3,927.04 per month. AR 1096, 1683.

Although Flaaen was unable to perform his previous occupation as a truck driver, he qualified for retraining. Flaaen obtained an associate's degree in Media Design and applied to the University of Washington ("UW") to pursue a bachelor's degree in Art/Media/Culture. UW accepted Flaaen, and his expected graduation was December 2014. On November 4, 2014, Principal referred Flaaen's file for an independent review "to determine which occupations would meet Gainful requirement of $47,124.48." AR 1041. On December 12, 2014, a rehabilitation consultant from Adling and Associates produced a report that listed potential occupations and salaries as follows:

| Occupation Sample | Mean/Median Wages* |
|---|---|
| Producer | $49,525 |
| Sales-Service Promoter/ | $54,517 |
| Graphic Designer | $50,461 |
| Public-Relations | $65,395 |
| Representative/Reporter | $29,557 |

AR 1849 ("Adling Report").

On December 24, 2014, Principal terminated Flaaen's benefits. AR 1836–9. In relevant part, Principal's letter provides as follows:

We have been evaluating your current employability and on 12/12/2014 obtained an updated and current Labor Market Search. Based off of the Labor Market Search with your current educational and work history we found several Gainful Occupations that you are capable of performing on a full time basis. Examples would be Producer which has a mean or median wage of $49,525.00 Annually, Public Relations Representative which has a mean or median annual wage of $65,395.00, Sales-Service Promoter which has a mean or median annual wage of $54,517.00.

AR 1837. The letter also provided that Flaaen could seek reconsideration of the decision. AR 1838.

On June 22, 2015, Flaaen appealed. AR 935–68. As part of his appeal, Flaaen asserted that his relevant work history was as follows:

> During his education, Mr. Flaaen developed and produced several documentary films both by himself as well as working collaboratively with other student filmmakers. He interned at Sirius Films as a camera operator while attending Clover Park Technical College. While at the University of Washington he held an internship with the Greater Tacoma Community Foundation in which he produced local community interest videos for Kickstarter to raise funds for the Foundation.
>
> Mr. Flaaen did not work while he was attending college full-time. After graduating, he accepted a part-time position teaching art classes to children with the Young Rembrandts. He has taught a total of 2 classes to date. Each class is 2 hours in length. He was paid $60 per class. He is not scheduled on a regular basis as the company does not offer a schedule of ongoing classes, but rather has short-term contracts at local venues.
>
> In January, 2015, Mr. Flaaen opened his own production company, Mariposa Productions. He develops and produces video segments for use by local companies. While Mr. Flaaen has been able to secure a couple of contracts which he has completed at this time, he does not have a regular or guaranteed income.

AR 937.

Flaaen's primary contention on appeal was that Principal's decision was based on "a deeply flawed employability assessment and labor market survey . . . ." AR 935. Flaaen asserted that Principal's own requirements for any assessment were as follows:

> l. Any job for Mr. Flaaen must pay at least $3,927.04 per month.
> 2. Any job must be light strength work based on Mr. Flaaen's restrictions and limitations.
> 3. The job must be supported by research, and use national data only if local data is unavailable.
> 4. The assessment must avoid "transitory work, sales positions, . . . or job ad quotes."
> 5. Mr. Flaaen must be able to "reasonably compete" for the openings.
> 6. Jobs should not be included if they require lengthy on-the job training.

AR 938 (citing Principal's November 2014 work order to the independent consultant).

Based on these requirements, Flaaen argued that "Principal made three very glaring

analytical mistakes" for potential occupations.  Flaaen described these mistakes as

follows:

> 1. <u>Median Income Data Unreasonable</u>. Adling used median income data for each job, instead of entry-level income data. Mr. Flaaen has not worked in eight years, and his previous occupation was truck driver. His current earnings capacity is entry level, not median income level.
> 2. <u>Contacts Inadequate</u>. Adling did not review actual job postings to find jobs actually available, but physically contacted companies, and asked them questions. While they all identified bare minimum job qualifications/requirements for these jobs, none indicated an interest in hiring someone with bare qualifications. Nor did they divulge any salary information whatsoever. It is wholly unreasonable to believe these minimum qualification job "prospects," even if available, would pay a the median salary. To put it another way, assuming these contacts were looking to hire someone worthy of a median salary, it is unreasonable to assume Mr. Flaaen would be able to reasonably compete for the jobs.
> 3. <u>Used National Data, Not Local State Data</u>. The Adling Report used the OASYS and McCroskey Vocational Quotient System. Conversely, the SCS Report supporting Mr. Flaaen's Appeal relied on the WOIS/The Career Information System which is a Washington State specific database pulling all national data from the BLS as well as local state and regional data for its information.

AR 939.

Flaaen obtained his own vocational assessment to submit with his appeal.  On June

16, 2015, vocational consultant Anne Kemerer Jones on behalf of Strategic Consulting

Services produced a report ("SCS Report") assessing Flaaen's employability.  AR 944–8.

Ms. Jones concluded that Flaaen was not employable in four of the five occupations

listed in the Adling Report.  *Id.*  Regarding the fifth occupation, Ms. Jones concluded as

follows:

Mr. Flaaen is just re-entering the labor market after being off work completely for over 8 years. In my opinion, his current earning capacity is consistent with the 25th percentile for Photographer, or $1,655 per month. However, there is almost no opportunity for advancement as the median wage is $1,915 per month.

I recommend that Mr. Flaaen focus on building his portfolio as a freelance Producer and networking within his local community. After 2-3 years, his earning capacity will equate to the 25th percentile for Producers, which is $2,610 per month. Since WOIS reports that demand for these jobs is projected to be slow and competition very strong, Mr. Flaaen may not be able to improve his earning potential beyond the 25th percentile.

AR 947–8.

On July 1, 2015, Principal referred Flaaen's file, including his full appeal, to Genex Services, LLC for another vocational assessment. AR 771. On July 15, 2015, Genex employee Catherine L. Phillis-Harvey produced a report concluding that Flaaen qualified as a Producer/Director, Film and Video Editor, and a Camera Operator for Television, Video, and Motion Pictures, which earned median annual salaries of $55,340 to $69,120. AR 776. Ms. Phillis-Harvey concluded as follows:

The conclusions in the [SCS Report] state that he is re-entering the work force after being off work completely for over 8 years. According to [Flaaen's] LinkedIn profile, he has been a producer since 2010 for Marisopa Productions and therefore has 5 years of experience. It was also noted that he has been an actor since 2008. And, thus, he would have more experience in the occupations noted to be appropriate. Also, it should be noted that his Bachelor's Degree in Arts, Media, and Culture was secured in 2014. Thus, his educational background should be current to today's industry standards thus making him more marketable.

Thus, it is this consultant's professional opinion that Mr. Flaaen would be competitive in a job search and would be qualified for the positions listed above by this consultant. These occupations are; Producer, Camera Operator, Film & Video Editors, Director, Writer, Cinematographer, Actor. The wages are outlined in the above information and are average wages for the targeted geographical labor market area. As stated, the information obtained during vocational research indicates that he has five years of experience in the occupation of Producer with Marisopa

Productions, 8 years as an Actor, and 4 years of experience with Grit City
Productions. Thus, this consultant does not agree that his wages would be
entry level. He has work experience and he has a recent degree in the field.

AR 778.

On July 28, 2015, Principal denied Flaaen's appeal relying exclusively on Ms.
Phillis-Harvey's report and conclusions. AR 758–761. Moreover, Principal requested
additional information from Flaaen as follows:

> During our review of the claim appeal, we found information that
> indicates that Mr. Flaaen has been working for at least 5 years, possibly
> longer. We will need to be provided with Mr. Flaaen's tax returns from
> 2007, 2008, 2009, 2010, 2011, 2012, 2013 and 2014.

AR 761.

On September 18, 2015, Flaaen filed another appeal. AR 709–721. Flaaen argued
that Ms. Phillis-Harvey's vocational information "was poorly researched and drew
unreasonable conclusions." AR 711. For example, Flaaen objected to the conclusions
regarding his work experience as follows:

> (a) During his internship a camera operator, he was using and
> operating an IPhone 4. The entire shoot was done with an IPhone 4, and he
> did not operate a full sized camera. Moreover, he cannot operate full sized
> camera per his restrictions and limitations on which there is no dispute.
> (b) Mr. Flaaen used the name Mariposa Productions to credit his
> schoolwork at Clover Park Technical College. His professors urged their
> students to come up with a name to use for class assignments. Mariposa
> Productions is a name that Mr. Flaaen has only used for schoolwork.
> Mariposa Productions has never produced anything for profit.
> (c) Mr. Flaaen has worked on a very limited basis as a part-time art
> teacher for Young Rembrandts, a children's art class franchise. He has
> never taught a class by himself. This is a very entry level job that involves
> teaching art to children. Submitted as a website link with this Voluntary
> Appeal and incorporated herein by reference are the job requirements to
> become a teacher for Young Rembrandts,
> http://www.youngrembrandts.com/become-a-teacher. Note, a college

degree is not required. Further, attached as Exhibit "1" to Mr. Flaaen's declaration is a list of all of Mr. Flaaen's income from this job. He has made $451.72 before taxes.

(d) Mr. Flaaen's acting work has been through his local community theatre. His participation is unpaid. He is not seeking to work as a professional actor, nor would he have the opportunity to work professionally in his local economy.

(e) Grit City productions is a loose association of artists that get together to share ideas, and create art together. It is not a formal company, it has never made a profit, and there is no intention to turn it into a for-profit enterprise.

(f) Mr. Flaaen has applied for, and been turned down for a variety of jobs: the Tacoma Art Museum for a content marketing position; a program analysis coordinator position, and producer for Amazon; video producer and content manager for Microsoft; and for Seattle Transit's video production manager. As well, he has applied for jobs at Home Depot, Target, and Nordstrom but did not meet their physical qualifications.

AR 712–3. Flaaen submitted a declaration under penalty of perjury in support of these facts. AR 716–21.

Furthermore, Flaaen argued that, to the extent that he did qualify for one of the jobs in Ms. Phillis-Harvey's report, he would only make entry level wages. AR 714. Flaaen supported this argument as follows:

Mr. Flaaen has *never made a dime* as a producer, actor, camera operator, film & video editor, director, writer, or cinematographer. His experience is at the armature [sic] level, not professional. He has never been hired to work in any these capacities by anyone for any amount of money. He cannot reasonably compete for any of these jobs at a median or mean level income. In fact, as noted above he has applied, but never been hired for any of these positions even at an entry level. Moreover, as pointed out in Mr. Flaaen's first Appeal Letter, competition for these jobs is "fierce".

*Id.*

On October 8, 2015, Principal retained Beth Gardner to complete another vocational assessment. AR 541. On October 19, 2015, Ms. Gardner produced a report.

AR 507–33. Her report listed numerous skills Flaaen gained through his education. AR 511. As a result of those skills, Ms. Gardner concluded that the "skills suggest several possible vocations within recommended physical restrictions, with the Graphic Designer umbrella of jobs, entry level." *Id*. Ms. Gardner listed several job postings for relevant jobs, all of which appear to be within the graphic designer field. AR 512. The wages for these positions were $36,351 for the lower 25%, $48,427 for median, and $61,801 for upper 25% of positions in Tacoma/Pierce County and $45,943 for the lower 25%, $58,790 for median, and $73,776 for upper 25% of positions in Seattle/King County. *Id*.

On December 7, 2015, Principal upheld the denial of Flaaen's benefits. Based on the skills identified by Ms. Gardner and other information, Principal "used a resource called Economic Resource Institute (ERI) to identify existing and available Gainful Occupations in the Seattle/Tacoma/Bellevue, Washington area that he can perform." AR 270. Principal identified relevant occupations as follows: transportation manager, fleet manager, graphic designer, and assistant video editor. Principal has submitted the ERI reports for these positions, and the reports provide a disclaimer that "the software application and reports are designed for use by qualified, experienced job experts and should be considered only a starting point for your research." *See*, *e.g*., AR 306 (report for fleet manager). Principal has not identified the job expert that consulted these reports or whether these reports were only the starting point for its employee's research. Regardless, Principal claimed that "the annual mean wage" for transportation manager and fleet manager were $101,170 and $69,810, respectively, and "the annual wage" for

1  graphic designer and assistant video editor were $59,460 and $54,370, respectively. The

2  denial did not address Flaaen's arguments or evidence.

3       Flaaen filed this suit three days later.

4              **III.    DISCUSSION AND FINDINGS**

5       This matter comes before the Court as a "bench trial on the record." In *Kearney*,

6  the Ninth Circuit "created a 'novel form of trial,' in which the district court, subject to its

7  discretion to consider additional evidence under limited circumstances, is to conduct 'a

8  bench trial on the record.'" *Thomas v. Oregon Fruit Products Co.*, 228 F.3d 991, 996

9  (9th Cir. 2000) (quoting *Kearney v. Standard Ins. Co.*, 175 F.3d 1084, 1095 (9th Cir.

10  1999)). "In a trial on the record . . . the judge can evaluate the persuasiveness of

11  conflicting testimony and decide which is more likely true." *Kearney*, 175 F.3d at 1095.

12       The Court has concluded that the denial of Flaaen's benefits is subject to *de novo*

13  review. Dkt. 28. On *de novo* review, the Court must decide "whether [Flaaen] was

14  disabled in the sense defined by the policy." *Kearney*, 175 F.3d 1093. "[W]hen the court

15  reviews a plan administrator's decision under the de novo standard of review, the burden

16  of proof is placed on the claimant." *Muniz v. Amec Const. Mgmt., Inc.*, 623 F.3d 1290,

17  1294 (9th Cir. 2010).

18       In this case, the parties dispute whether Flaaen could obtain gainful occupation as

19  defined by the Plan. The first issue is interpretation of the Plan. After resolving this

20  dispute, the Court will consider the competing evidence to determine whether Flaaen

21  meets the Plan's limitation of benefits.

22

**A.     Interpretation**

"When faced with questions of insurance policy interpretation under ERISA, federal courts apply federal common law." *Padfield v. AIG Life Ins. Co.*, 290 F.3d 1121, 1125 (9th Cir. 2002) (citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 110 (1989)).  The court must "interpret terms in ERISA insurance policies in an ordinary and popular sense as would a person of average intelligence and experience." *Babikian v. Paul Revere Life Ins. Co.*, 63 F.3d 837, 840 (9th Cir. 1995) (internal quotations and citation omitted).

Principal relies on *Geiger v. Aetna Life Ins. Co.*, 845 F.3d 357 (7th Cir. 2017), for the proposition that "an occupation is gainful even if the claimant would not be able to earn median/mean wage upon starting." Dkt. 45 at 10.  In *Geiger*, the court concluded that the termination of benefits was not arbitrary and capricious.  In relevant part, the insured argued "that as an employee with no prior experience as a job development specialist or commission agent she would likely earn less than the median income identified for those jobs." *Id*. at 363.  The policy, however, defined "gainful occupation" as one that "results in; or can be expected to result in" a qualifying salary. *Id*.  The court concluded that the vocational assessment had "rational support in the record" because the policy language "'can be expected to result in,' appears to contemplate that an employee's income would increase as he or she gains experience." *Id*.  In other words, it was not arbitrary and capricious for the insurer to interpret "gainful occupation" as an occupation in which the insured could eventually earn the median wage even if the insured was currently only able to secure entry-level wages.

*Geiger* is easily distinguishable.  First, the standard of review in *Geiger* was

arbitrary and capricious, whereas the standard of review in this case is *de novo*.  Under

the former standard, an insurer's decision will withstand judicial scrutiny "so long as it is

possible to offer a reasoned explanation, based on the evidence, for that decision."  *Id.* at

372 (quoting *Semien v. Life Ins. Co. of N. Am.*, 436 F.3d 805, 812 (7th Cir. 2006)).  On

the other hand, "[w]hen conducting a *de novo* review of the record, the court does not

give deference to the claim administrator's decision, but rather determines in the first

instance if the claimant has adequately established that he or she is disabled under the

terms of the plan."  *Muniz v. Amec Const. Mgmt., Inc.*, 623 F.3d 1290, 1295–96 (9th Cir.

2010).  Therefore, at most, *Geiger* stands for the proposition that the insured decision was

supported by a reasoned explanation based on the evidence in that case.

Second, the policy language at issue in *Geiger* is different than the language at

issue in this case.  Even if the policy language in *Geiger* could be considered similar to

the language at issue here, the insured's interpretation in *Geiger* is at most one

interpretation to be considered by the Court and by no means the only reasonable

interpretation.  On *de novo* review, the Court may consider the reasonableness of other

proposed interpretations.

Turning to the language at issue, Principal argues that using the median wage "is

common practice within the industry . . . ."  Dkt. 45 at 9.  Principal is essentially arguing

that the term "could reasonably be expected to earn" should be interpreted to mean that a

median wage could be earned at any time in the future.  This assertion is suspect as to

both the temporal and the amount limitations.  For example, as long as the identified

occupation has a qualifying median wage, every insured that pursued retraining in that occupation would be "gainfully employed" upon completion of the retraining requirements. A new lawyer would be gainfully employed the day she graduated from law school because, according to Principal, she could be expected to earn the median lawyer wage sometime during her career. Similarly, choosing the median wage of every profession is an arbitrary heuristic because it in no way relates to the experience or qualifications of the specific insured. Thus, Principal's proposed interpretation is flawed and strained, and "no compulsion exists to torture or twist the language of the policy." *Babikian*, 63 F.3d at 840 (*Evans v. Safeco Life Ins. Co.*, 916 F.2d 1437, 1441 (9th Cir. 1990)).

Even if the Court found Principal's proposed interpretation reasonable, it at most creates an ambiguity. "[I]f, after applying the normal principles of contractual construction, the insurance contract is fairly susceptible of two different interpretations, . . . the interpretation that is most favorable to the insured will be adopted." *Blankenship v. Liberty Life Assur. Co. of Boston*, 486 F.3d 620, 625 (9th Cir. 2007). Flaaen's proposed interpretation, and the one that is the most reasonable, is that the term "could reasonably be expected to earn" means "what is reasonably likely now, as of the date of denial of his benefits." Dkt. 43 at 7. Such an interpretation results in a case-by-case evaluation of each insured and the current, reasonable prospects for each insured. Faced with two different interpretations, the Court must adopt Flaaen's proposal because it is more favorable to him. Having resolved this alleged ambiguity, the Court must address Principal's argument regarding the slippery slope to "rampant abuse."

Principal argues that gainfulness should not depend on the insured's subjective choice of an occupation. For example, Principal argues that a lawyer should not qualify for benefits if the lawyer chooses to work pro bono instead of working for a law firm. Dkt. 45 at 9 n.1. The Court agrees that such a hypothetical would raise interesting issues. This question, however, is beyond the scope of this case because there are no facts to support the proposition that Flaaen is working for free or even a low-paying job despite an ability to secure a median wage position. Should Principal discovery evidence of such abuse, then it is free to terminate benefits under the Plan subject to judicial review. The record, however, is silent on this issue, and there is no need to issue an advisory opinion.

**B.    Application**

One of Flaaen's objections to Principal's denials is that Principal has presented a moving target at each stage of denial. Initially, Principal asserted that Flaaen qualified for producer, sales-service promoter, graphic designer, public relations, and representative/reporter. AR 1849. Then, on appeal, Principal asserted that Flaaen qualified for producer/director, film and video editor, and camera operator. AR 776. Finally, on the second appeal, Principal asserted that, based on a vocation assessment, Flaaen qualified for the graphic designer umbrella of occupations and, based on its own research, Flaaen also qualified for transportation manager or fleet manager. AR 270, 512. While this moving target may seem arbitrary and capricious, on *de novo* review it is Flaaen's burden to show that he could not reasonably be expected to earn an amount equal to or greater than his monthly benefit. *Muniz*, 623 F.3d at 1294. Flaaen's opposition is essentially based on two arguments: (1) he is not qualified for some of the

occupations and (2) he is not able to obtain the median or mean salary in any of the occupations for which he is qualified. The Court will consider these arguments and occupations.

### 1. Transportation manager or fleet manager

Flaaen argues that the record does not support Principal's assertions that he is qualified for either of these jobs. Dkt. 33 at 20–21. The Court agrees. Although Principal contends that Ms. Gardner, a vocational consultant, "identified the occupation of Fleet/Transportation Manager," the record does not support this assertion. Dkt. 34 at 16, Dkt. 37 at 11–12. The Court is unable to locate any reference to these occupations in Ms. Gardner's report. *See* AR 507–33. Instead, Principal's letter upholding its termination of Flaaen's benefits is carefully crafted to convey that its employee used the skills identified by Ms. Gardner to conduct her own research. In relevant part, that letter provides as follows:

> Using the transferrable skills addressed in [Ms. Gardner's] vocational assessment report along with understanding Mr. Flaaen's work history and physical restrictions/limitations, *we* used a resource called Economic Resource Institute (ERI) to identify existing and available Gainful Occupations in the Seattle/Tacoma/Bellevue, Washington area that he can perform.

AR 270 (emphasis added). A review of the ERI material shows that it is only to be used by experienced job experts and only as a starting point for further research. *See*, *e.g.*, AR 306. Principal fails to show that either of these requirements were met. Thus, Principal's conclusion that Flaaen qualifies for these positions lacks persuasive evidentiary support.

On the other hand, Flaaen relies on the ERI material to argue that he "is not even close to qualified" for either position. Dkt. 33 at 20–21. For example, the fleet manager position requires one to two years of specific vocational preparation. AR 306. Although Flaaen has many years of experience as a truck driver, there is no evidence establishing that Flaaen has experience with the job requirements pertaining to managing a fleet of vehicles. *See* AR 310. There is no evidence that Flaaen has ever managed drivers, organized routes, managed the acquisition of vehicles, or dealt with the applicable government regulations. Therefore, the Court concludes that Flaaen has met his burden by showing that he likely could not reasonably gain employment as a fleet or transportation manager.

## 2. Other Occupations

This category of occupations includes the graphic designer, video production/editor, and marketing/sales type of jobs. Although Flaaen does take issue with some of the requirements for some of these occupations, his main objection is that, even if he did obtain a position in one of these fields, it would be an entry level position and he would not be paid a median or mean wage. Dkt. 33 at 9–21. The Court agrees because the weight of the evidence favors Flaaen. First, Flaaen submitted a vocational assessment that he obtained on his own behalf. The SCS Report provides that Flaaen could obtain a position as a photographer or a producer, but his earning capacity is consistent with the 25% percentile. AR 946–947. The low earning capacity is based on his inexperience in the field. *Id*. According to the report, Flaaen could reasonable obtain a position paying approximately $2,000 to $2,600 per month. This is persuasive evidence

that Flaaen could not reasonably be expected to earn an amount equal to or greater than his monthly benefit of $3,927.04.

Second, Principal's most recent vocational assessment favors Flaaen. Ms. Gardner concluded that Flaaen's "skills suggest several possible vocations within recommended physical restrictions, with the Graphic Designer umbrella of jobs, entry level." AR 511. A reasonable assumption based on the conclusion that Flaaen's employment opportunities are at entry level is that his earning capacity is in the lower 25% of positions. Thus, he could reasonably obtain a position with a salary of approximately $36,351 to $45,943. AR 512. These amounts are not equal to or greater than his monthly benefit. Interestingly, Principal ignored this portion of Ms. Gardner's report and conducted its own flawed vocational assessment. Regardless, these are two vocational assessments concluding that Flaaen's earning capacity is an entry-level to the lower 25% percentile.

Third, the only assessment favoring Principal's position is deeply flawed. Although Ms. Phillis-Harvey "does not agree that [Flaaen's] wages would be entry level," she fails to offer an opinion on Flaaen's earning capacity. Even if Flaaen has some experience in the field, that doesn't mean that he could secure a wage greater than the lower 25% percentile for a particular position. In other words, there is little to no evidentiary support for the assumption that some experience in a field means an individual could earn the median wage in the field.

Furthermore, the basis for Ms. Phillis-Harvey's assessment of Flaaen's experience is suspect. Specifically, she relied on Flaaen's social media profiles and listed job titles

to reach her conclusions that he possessed relevant experience. For example, Ms. Phillis-Harvey based her conclusion that Flaaen qualified as a camera operator on the fact that "he interned at Sirius Films as a Camera Operator." AR 772. Flaaen declares that his internship consisted of operating an IPhone camera and that his undisputed medical limitations preclude him from operating a full sized camera. AR 712. Flaaen's admissible declaration completely undermines Ms. Phillis-Harvey's unsupported and faulty conclusion.

Likewise, Ms. Phillis-Harvey's conclusions based on Flaaen's social media profile are suspect. For example, Ms. Phillis-Harvey concluded in 2015 that Flaaen had five years of experience as a producer because his LinkedIn profile stated that he started Marisopa Productions in 2010. AR 778 ("According to [Flaaen's] LinkedIn profile, he has been a producer since 2010 for Marisopa Productions and therefore has 5 years of experience."). Flaaen declares that Marisopa Productions was the name he used to credit his schoolwork and never produced anything for profit under that name. AR 712. Moreover, he contends that he:

> has *never made a dime* as a producer, actor, camera operator, film & video editor, director, writer, or cinematographer. His experience is at the armature level, not professional. He has never been hired to work in any these capacities by anyone for any amount of money. He cannot reasonably compete for any of these jobs at a median or mean level income. In fact, as noted above he has applied, but never been hired for any of these positions even at an entry level. Moreover, as pointed out in Mr. Flaaen's first Appeal Letter, competition for these jobs is "fierce".

AR 714. Thus, the admissible declaration completely undermines Ms. Phillis-Harvey's unsupported conclusion.

In sum, the great weight of the evidence supports Flaaen's position that he could not reasonably secure a salary equal to or greater than his monthly benefit in any occupation for which he is qualified or identified by Principal. Moreover, Principal consistently ignored Flaaen's evidence and fails to provide any persuasive evidence contesting or undermining the essential facts contained in Flaaen's declaration. Therefore, these findings lead to a conclusion in favor of Flaaen.

## IV. CONCLUSION OF LAW

1. The standard of review is *de novo*.

2. Principal's interpretation of the term "gainful occupation" is unreasonable.

3. Even if Principal's interpretation were reasonable, the term is subject to two different interpretations and is, therefore, ambiguous.

4. Ambiguous terms in an ERISA-governed insurance contract are construed against the insurer and in favor of the insured.

5. The reasonable interpretation of the term "gainful occupation" requires an evaluation of the insured's actual employment prospects and wages based on his current experience and qualifications.

6. Flaaen has shown that he is currently unable to procure any gainful occupation in any field identified or proposed by Principal.

7. Flaaen is entitled to reinstatement of benefits and an award of benefits back to the date of termination because he is not gainfully employed as defined by the Plan.

# V.    ORDER

Therefore, it is hereby **ORDERED** that Flaaen's trial brief on the administrative record (Dkt. 33) is **GRANTED** and Principal's motion for judgment on the administrative record (Dkt. 34) is **DENIED**.  Flaaen shall submit a proposed judgment in accordance with this opinion.

Dated this 27th day of September, 2017.

BENJAMIN H. SETTLE
United States District Judge